IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JOHN TURNER, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 18-2202-KHV |
| | ) | |
| UNIFIED GOVERNMENT OF WYANDOTTE | ) | |
| COUNTY / KANSAS CITY, KANSAS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

John Turner brings suit against the Unified Government of Wyandotte County / Kansas City, Kansas ("Unified Government") for employment discrimination, harassment and retaliation based on race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. Pretrial Order (Doc. #55) filed August 16, 2019. This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #66) filed October 21, 2019. For reasons stated below, the Court sustains defendant's motion in part.

### Factual Background

The following facts are undisputed or, where disputed, viewed in the light most favorable to plaintiff.[1]

---

[1] The parties assert more than 600 facts. The Court includes only those facts that are material to resolution of this motion and that the parties support with evidence which would be admissible at trial. Fed. R. Civ. P. 56(c)(4).

Plaintiff is African-American.   Since 1986, the Kansas City, Kansas Police Department ("KCKPD"), which is a department of the Unified Government, has employed him as a police officer.   Pretrial Order (Doc. #55) at 2.

## I.   Dignitary Protection Detail

In January of 2015, Chief of Police Terry Zeigler awarded plaintiff a primary position in a new unit called the Dignitary Protection Detail ("DPD"), which consisted of two primary and two secondary officers.   DPD officers provided protection services for, and worked closely and attended events with elected officials, commissioners, community dignitaries and the mayor.   A DPD assignment had a higher profile than a patrol assignment.   From its inception, the DPD's existence was a political issue and at meetings between the mayor and a Unified Government commissioner, the commissioner questioned DPD finances.

Chief Zeigler awarded Officer Steve Rios the other primary DPD position and gave Officers Steve Kopp and Christopher Blake the secondary positions.   Secondary officers were relief officers and only worked in the DPD about once a month.   In the spring of 2015, Officer Kopp replaced Officer Rios as a primary DPD officer.   In July of 2015, Officer Steve Williams, who is African-American, replaced Officer Kopp as a primary DPD officer and Officer Kopp left the unit.   From July of 2015 to March of 2016, plaintiff and Officer Williams were the primary DPD officers.   As of August 24, 2015, Officer Blake was the only secondary DPD officer.   In other words, during the relevant period, both primary DPD officers were African-American (plaintiff and Officer Williams) and the secondary DPD officer (Officer Blake) was white.

According to Officer Williams, other officers made comments about the DPD such as "the mayor and his brothers are changing the inner city" and "the brothers [are] protecting the mayor." Affidavit Of Steve Williams, Exhibit 27, Exhibits In Support Of Plaintiff's Response Motion (Doc.

#74-26) filed November 26, 2019 at 3-4.   Officer Williams felt like these comments indicated that other officers targeted him and plaintiff and expected them to fail.

## II.    Recording Time In DPD

Plaintiff and Officer Williams reported to Major Rodney Smith, who in turn reported to Chief Zeigler.   In January of 2016, after defendant promoted Major Smith to deputy chief, plaintiff and Officer Williams reported to Major Michael York.   Sergeants, captains and majors can issue discipline, but Chief Zeigler has ultimate disciplinary authority.

Plaintiff is an hourly employee.   Initially, his scheduled hours were Monday through Friday from 8:00 a.m. to 4:00 p.m.   In July of 2015, plaintiff's schedule changed to Monday through Friday from 11:00 a.m. to 7:15 p.m.   Plaintiff's new schedule was "flex flex," which meant that the needs of the unit determined his hours.   Before he arrived at city hall, plaintiff would sometimes conduct surveillance of the mayor's home and counted that time as scheduled work time.

DPD officers recorded time differently than officers in other units did.   Chief Zeigler and Major Smith told DPD officers that they did not need to keep a daily activity log, sign in at the very beginning of shifts or submit a form before taking a day off.   Accordingly, each day after arriving at city hall, instead of recording the exact hours that he worked, plaintiff would write his scheduled start time and end time on the daily sign-in sheet.   He did not later correct the sign-in sheets to reflect actual hours worked, and he did not keep a personal notebook or log of time actually worked and what he did throughout the day.   Chief Zeigler also told plaintiff that DPD officers would be working a lot of overtime, and that they should keep their overtime budget under a certain amount.   With the budget in mind, plaintiff did not always record his overtime hours.

III.     **First Internal Affairs Investigation: Allegations Of "Double-Dipping" (December of 2015)**

Plaintiff and his brother, Michael Simmons, own a private security company called Simmons Security.   Simmons Security has 35 to 45 employees, most of whom are police officers who work for the company part time while off duty.

In December of 2015, the Unified Government commissioner who had questioned the finances of the DPD reported that an anonymous source had informed her that plaintiff, Officer Williams and Simmons were not working their scheduled hours for defendant and were working part time for Simmons Security while defendant was paying them.   The anonymous source also informed the commissioner that plaintiff and Simmons were working for Simmons Security and receiving payment from a Unified Government contract.   The parties refer to the commissioner's allegations as allegations of "double-dipping."

On December 2, 2015, Major Smith directed the Internal Affairs ("IA") unit to follow up on the double-dipping allegations.   Internal Affairs Detective Pamela Waldeck, who is white, led the investigation into whether Officer Williams and plaintiff were double-dipping.   The investigation was categorized as criminal special, i.e. she would send the case file to the district attorney for review.   Detective Waldeck focused her investigation on the time entries from February through March 10, 2016 and only investigated plaintiff and Officer Williams because they were the primary DPD officers and the subjects of the allegations.   She did not investigate Officer Blake or the time entries of former DPD Officers Kopp and Rios.

As part of the investigation, Detective Waldeck conducted surveillance and interviews. She interviewed Officer Kopp and asked him if he had talked to the commissioner about the double-dipping allegations.   Officer Kopp told Detective Waldeck that the commissioner had

asked him if his replacement was black.   Detective Waldeck did not further investigate the commissioner's statements.   Detective Waldeck did not interview the mayor or anyone in his office about plaintiff's time or work as a DPD officer.

On March 12, 2016, Chief Zeigler placed plaintiff on administrative leave pending the outcome of the double-dipping investigation.   As set out in a letter to plaintiff from Chief Zeigler, the terms of plaintiff's administrative leave were as follows: "You are relieved of your duties as a law enforcement officer, with pay, until further notice.   You are prohibit[ed] from working any off-duty employment, that requires your law enforcement powers or jurisdictional authority, until further notice by the Chief of Police or his designate."   Pretrial Order (Doc. #55) at 3.   Plaintiff was on paid administrative leave for five months.

In a memorandum to Major York (plaintiff's supervisor) dated April 13, 2016, Detective Waldeck summarized the results of her investigation up to that time.   She found that "[d]uring the surveillance of Officer Turner, he worked 17 days, 2 half days, and submitted 23 hours of overtime.   Of those days worked there were 21 hours that were not accounted for during his scheduled duty hours."   Deposition Exhibit #67, Memorandum From Captain Pamela Waldeck To Major Mike York Dated July 5, 2016 (Doc. #68-11) at 71.   Defendant forwarded plaintiff's case file to the District Attorney's Office for review and possible filing of criminal charges.   The DA declined prosecution but stated that he believed that while recording their work hours, Officer Williams and plaintiff had made false entries with intent to defraud and that the DA had sufficient evidence to bring criminal charges.   See Deposition Exhibit #68, Memorandum From LTC. Tyrone Garner to Chief Zeigler Dated July 14, 2016 (Doc. #68-11) at 83.   The DA returned the file and Internal Affairs transitioned it from a criminal special investigation to an administrative special investigation, then forwarded it to Deputy Chief Tyrone Garner.

Deputy Chief Garner, who is African-American, reviewed the IA file and made findings, which he included in a memorandum to Chief Zeigler dated July 14, 2016. Deputy Chief Garner's memorandum stated that plaintiff's actions reflected dishonesty in the inaccurate notation of time worked and sustained the allegation that plaintiff was not working his scheduled hours. The investigative file, including Deputy Chief Garner's memorandum, was then forwarded to Chief Zeigler. After reviewing the file, Chief Zeigler agreed with Deputy Chief Garner's conclusion.

On August 4, 2016, Chief Zeigler issued plaintiff a letter of discipline dated August 2, 2016. In the letter, Chief Zeigler stated, "the investigation revealed dishonesty in the inaccurate notation of the actual time you worked," quoted statements from the DA and found that plaintiff had violated Rule 3.23, which prohibits dishonesty, and Rule 3.16, which prohibits making false reports. Deposition Exhibit #5, Letter Of Discipline From Chief Terry Zeigler To Officer J. Turner Dated August 2, 2016 (Doc. #68-9) at 46. Chief Zeigler imposed a 30-day suspension, removed plaintiff from his position in the DPD and prohibited him from re-bidding into the unit for 25 months. The letter of discipline also included a last chance provision which stated as follows: "Any violation of the Kansas City, Kansas Police Department's Rules & Regulations 3.15, 3.16, 3.23, and/or 3.33, during the duration of your employment with the Department will result in termination, irrespective of the existence of just cause and such termination shall be not be grieved." Id.

The 30-day suspension and last chance provision is consistent with what Chief Zeigler imposed on Officers B.B. and B.M., who are white, for violating Rule 3.16 by falsely reporting how drugs were discovered and recovered in an arrest. See Letter Of Discipline To Officer B.B. Dated June 16, 2015 (Doc. #68-14) at 35; Letter Of Discipline To Officer B.M. Dated June 16, 2015 (Doc. #68-14) at 36. In August of 2016, he imposed the same discipline on a white detective

who violated Rule 3.23.[2]   See Letter Of Discipline To Detective J.L. Dated August 2, 2016 (Doc. #68-14) at 33.

Chief Zeigler testified that he removed plaintiff from the DPD because he had committed major violations of the Rules and Regulations, i.e. Rules 3.16 and 3.23.   Statement of Fact #72. Because the DPD was a politically sensitive unit, Chief Zeigler felt that he should remove plaintiff from it.[3]

To challenge plaintiff's discipline, the union filed a grievance.   On October 3, 2016, Chief Zeigler responded in a memorandum which stated that on August 23, 2016, he had met with plaintiff to discuss the discipline for violation of Rules 3.16 and 3.23 and that during the meeting, plaintiff stated that he believed dispatch tapes, text messages and emails would prove that he was working outside of his duty hours to fulfill the DPD's mission and that he did not record his overtime.   Chief Zeigler indicated that IA had completed a follow-up investigation and found evidence that plaintiff did not work his entire shift on several occasions.   Chief Zeigler therefore denied the grievance and stated, "I do believe there is substantial evidence in [this IA case file] to justify the violations and the discipline issued to him."   Letter From Terry Zeigler To S. Kirkpatrick Dated October 3, 2016 (Doc. #68-9) at 49.

The union appealed Chief Zeigler's denial to a grievance board, which is the next step in the grievance procedure.   In April of 2017, the grievance board held a hearing.   At the conclusion

---

[2]      Plaintiff disputes this fact, but only asserts that the two officers who Chief Zeigler suspended in 2015 had made a false police report and not false time entries like plaintiff, and that defendant did not remove them from their positions or prohibit them from rebidding on their positions.   The letters of discipline, however, speak for themselves.

[3]      Plaintiff disputes this fact but does not dispute that Chief Zeigler testified to this, and he presents no contrary evidence.

of the hearing, the grievance board rescinded the original 30-day suspension and removed the Rule 3.23 violation (dishonesty).   The grievance board determined that plaintiff had violated Rule 3.16 by making false reports, however, and recommended a 3-day suspension.   Accordingly, on April 20, 2017, Chief Zeigler rescinded the discipline that he had issued on August 4, 2016 and imposed a 3-day suspension for violating Rule 3.16.

Effective August 18, 2016, defendant assigned plaintiff to West Patrol where he bid and obtained a regular position.   Plaintiff did not request that Chief Zeigler reinstate him to the DPD and Chief Zeigler did not do so.

## IV.    Internal Affairs Investigation Of Sgt. J.A.: Allegations Of Double-Dipping (August of 2018)

Sgt. J.A. was an officer in the community policing unit, which is a high-profile unit like the DPD.   In August of 2018, IA conducted a secret investigation into whether Sgt. J.A., who is white, worked off-duty during his scheduled work hours.   See Exhibit J, Letter of Discipline Dated April 9, 2019 (Doc. #74-2) at 96.   Because Sgt. J.A. was not aware of the investigation, defendant did not remove him from his position during the investigation.   See Depo. Of Deputy Chief Michael York (Doc. #74-1) at 71.   Sgt. J.A. admitted that he routinely left work early to go to his off-duty job and was paid by defendant and his off-duty employer at the same time. Defendant placed Sgt. J.A. on the veracity list and suspended him for 45 days for violations of Rules 3.23 (dishonesty), 1.10 (code of ethics), 2.24 (failure to supervise subordinates) and 20.07 (off-duty employment).   In addition, in relevant part, Sgt. J.A.'s letter of discipline contained a last chance agreement which stated that "any sustained violation of the off-duty policy (G.O. 20.07) will result in discipline up to and including termination of his employment."   See Exhibit J,

Letter of Discipline Dated April 9, 2019 (Doc. #74-2) at 97.

After the investigation, Sgt. J.A. returned to his position in the community policing unit.

**V.    Second Internal Affairs Investigation: Sexting Incident (August 4, 2016)**

On May 17, 2016, defendant learned that in 2014 and earlier, three officers – including plaintiff – had sent sexually explicit text messages to a female detective who was married. Detective Waldeck investigated the incident, and plaintiff admitted his involvement.   On August 4, 2016, Chief Zeigler issued a letter of discipline to plaintiff for violating Rule 2.27, which states that "[o]fficers shall not perform any acts or make any statements, which tend to bring the Department into disrepute or ridicule."   Statement Of Fact #91, Defendant's Memorandum In Support Of Summary Judgment (Doc. #67) filed October 21, 2019 at 20.   He imposed discipline of 20 points, the amount specified in the Rules and Regulations.[4]   A white officer admitted the same misconduct and received the same discipline as plaintiff.   Plaintiff does not claim that Chief Zeigler disciplined him for this incident because of race.

**VI.   Third Internal Affairs Investigation: Citizen Complaint (June of 2016)**

In June of 2016, a citizen complained that because he opposed a tax that supported security and cleaning services for downtown property owners, plaintiff had threatened to cease providing security services to him through Simmons Security.   On August 3, 2016, plaintiff admitted that he was aware that the citizen had publicly expressed his opposition to the tax but stated that his threat to cease providing security services was based on several problems at the citizen's building. Plaintiff denied any connection between the citizen's opposition to the tax and his threat to stop

---

[4]      Defendant disciplines officers on a point system, and all officers are subject to the Rules and Regulations.   If an officer accumulates more than 40 points in one year, it is a "major violation" and defendant suspends that officer.

providing security services to him.   Deputy Chief York[5] reviewed the IA file and recommended that Deputy Chief Garner find it "not sustained."   Deputy Chief Garner agreed with Deputy Chief York and did not discipline plaintiff for this complaint.

## VII.   Fourth Internal Affairs Investigation: Violation Of Terms Of Administrative Leave And Failure To File Off-Duty Form (September of 2016)

As noted above, one of the conditions of plaintiff's five-month administrative leave was that he could not work in off-duty employment that required his "law enforcement powers or jurisdictional authority."   See Statement Of Fact #102, Defendant's Memorandum In Support Of Summary Judgment (Doc. #67) at 24.   While investigating the foregoing citizen complaint, IA detectives came across information that plaintiff was working for Simmons Security while on leave.   IA then launched an investigation into whether plaintiff was violating the terms of his administrative leave.

On August 3, 2016, plaintiff explained that he had understood the conditions of his administrative leave to prohibit him from working off duty in his uniform.   He admitted that he had continued to operate Simmons Security during his leave but maintained that he was functioning in an administrative capacity, i.e. scheduling officers to work, taking calls from officers, etc.   He did not give the officers any advice or direction and did not think that this work required use of his authority as a police officer.   Plaintiff did agree that involvement with Simmons Security created the potential for use of his police authority.   He nevertheless maintained that as an owner of the company, he did not utilize any police powers to do scheduling or receive information about any incident that may have occurred on site.

---

[5]      In March of 2017, defendant promoted Major York to Deputy Chief over the Bureau of Operations.

During this investigation, plaintiff stated that he did not believe he had filed an updated off-duty employment form for 2016.   Defendant requires officers to file an off-duty employment form by January 10 of each year.   The officer is responsible for submitting the updated form and defendant does not check of see whether an officer has submitted the form unless the need arises. If for some reason defendant checks and finds that the off-duty form is not there, it is a violation of policy.

On September 13, 2016, Deputy Chief York reviewed the IA file and found that while plaintiff was on paid administrative leave, he was scheduling officers to work off duty for his security business and that plaintiff had agreed that this type of activity (scheduling, fielding phone calls from officers, etc.) could potentially fall within his authority as a police officer.   Deputy Chief York also found that plaintiff had violated a general order by failing to timely submit an updated off-duty employment form.   Based on the evidence, Deputy Chief York recommended to Deputy Chief Garner (who was at that time serving as Acting Chief) that he classify the case as "founded" and specified the general order and rules and regulations that he believed plaintiff had violated.

Deputy Chief Garner did not sustain the allegation that plaintiff had violated the terms of his administrative leave but did adopt the finding that plaintiff had violated a general order by failing to submit an updated off-duty employment form for 2016.   Until plaintiff, no one had ever been disciplined for failing to submit an updated form.   The standard discipline for such a violation is a one-day suspension, which Deputy Chief Garner imposed.

## VIII.    Early Warning System (July of 2016)

Accumulation of disciplinary action triggers an "Early Warning System."   Specifically, an officer triggers the early warning system any time, within a 90-day period, that he or she has

(1) three or more IA complaints that are classified as "Other Contacts" or (2) two or more IA complaints which result in an administrative or criminal investigation.   The early warning system applies to officers who have had negative interactions with citizens or use-of-force complaints. Its purpose is to identify officers whose behavior is problematic and intervene to correct that behavior before it causes further harm and jeopardizes the officer's career.   When complaints against an officer trigger the early warning system, IA reviews the officer's professional behavior to determine whether it requires intervention and notifies the officer's division commander, the bureau director and the chief of police.   The division commander is responsible for meeting with the officer regarding remedial measures.   The early warning system is not a form of discipline.

In July of 2016, plaintiff accumulated three IA complaints within 90 days.   Major Solomon Young, who is African-American and is the division commander over West Patrol, met with plaintiff to discuss the early warning notification.   During that meeting, plaintiff told Major Young that he thought defendant was targeting and harassing him because he is black.   Major Young documented this complaint in a memorandum that he sent to Deputy Chief Smith.[6]

## IX.     Veracity List (October of 2016)

Defendant maintains a "veracity list" of officers who commit Rules and Regulations violations that involve dishonesty, including Rules 3.16 and 3.23.   Defendant shares the veracity list with state and federal prosecuting authorities in Wyandotte County, Kansas.   The veracity list is a means of fulfilling what KCKPD believes are its legal obligations under Brady v. Maryland, 373 U.S. 83 (1963), and avoiding civil liability.   Inclusion on the veracity list has a negative impact on an officer and limits his or her opportunities to work with the federal government.   Once

---

[6]     In late 2015, defendant promoted Major Smith to Deputy Chief.

an officer is on the veracity list, he or she remains on it indefinitely.

In October of 2016, Captain Ronald Schumaker, Internal Affairs Commander, added plaintiff's name to the veracity list based on Chief Zeigler's determination in the double-dipping investigation that plaintiff had violated Rules 3.16 and 3.23.  When Captain Schumaker added plaintiff to the list, he mistakenly listed plaintiff's three IA complaints (i.e., the double-dipping, sexting and administrative leave conditions investigations) instead of only the double-dipping investigation.   Because defendant did not issue dishonesty findings in the sexting and administrative leave investigations, Captain Schumaker should not have listed those investigations.   Captain Schumaker listed them by mistake, and his mistakes carried forward on the veracity lists for 2017 and 2018.

## X.   Defendant's Failure To Complete Performance Evaluations (December of 2016)

Twice a year, in June and December, defendant conducts performance evaluations for law enforcement officers.   Since he started with the KCKPD, except for June and December of 2015 and June of 2016, when he was in the DPD, plaintiff has received performance evaluations twice every year.   As part of each performance review, an officer is asked to complete a "Productive Work Environment Advisory" that consists of two questions:

> 1) Are you aware of the department's strong commitment to a productive workplace free of any form of sexual harassment or discrimination or any other similar social, personal, or professional coercion?

> 2) Have you personally been the victim of any such harassment, discrimination, or coercion in the past year in your workplace?

Statement Of Fact #122, Defendant's Memorandum In Support Of Summary Judgment (Doc. #67) at 28-29.   The form has "yes" and "no" check boxes after each question.   Below the questions, the officer is asked, "If yes, please explain (may be brief or use additional sheets if necessary)."

Plaintiff completed his first productive work advisory form in 1999.   On that form and on each subsequent form, plaintiff checked "yes" in response to the first question, indicating that he was aware of the department's strong commitment to a productive workplace.   From 1999 through 2014, plaintiff answered "no" to the second question, indicating that he had not personally been the victim of any such harassment, discrimination or coercion in the past year.

Deputy Chief Smith, who supervised the DPD in 2015, was responsible for completing plaintiff's performance evaluations in June and December of 2015.   He did not complete performance evaluations for any officers in the unit.   Before December of 2016, plaintiff did not bring that matter to the attention of Deputy Chief Smith or anyone else.   Deputy Chief Smith did not realize that he had not completed a performance evaluation for plaintiff until plaintiff complained in December of 2016.   His failure was an oversight.   Deputy Chief Smith did not do anything to correct the oversight because by the time he realized it, he felt that it was too late to go back and do an evaluation and that it "would be compounding a foul-up."   Statement Of Fact #131, Defendant's Memorandum In Support Of Summary Judgment (Doc. #67) at 30.   In June of 2016, Deputy Chief York, who supervised the DPD as a major in 2016, did not give plaintiff an evaluation because plaintiff had been suspended.   Also, he was not aware that plaintiff had not received performance evaluations in 2015.   If Deputy Chief York had known that plaintiff had not received an evaluation in 2015, he would have completed one for him.

**XI.     First Internal Complaint Of Discrimination And Harassment (December of 2016)**

On his performance evaluation for July 1 through December 31, 2016, which he completed on December 12, 2016, plaintiff checked "yes" to the second question on the Productive Work Environment Advisory.   His explanation was as follows:

1)   SUSPENSION   DAYS   RECEIVED   RESULTING   FROM   INTERNAL

AFFAIRS COMPLAINTS INITIATED BY AN ELECTED OFFICIAL AND KCKPD. 2) NO PERFORMANCE EVALUATIONS RECEIVED SINCE DECEMBER 2014.

Statement Of Fact #125, Defendant's Memorandum In Support Of Summary Judgment (Doc. #67) at 29.  At the time, plaintiff had a pending grievance over the 30-day suspension which Chief Zeigler had imposed on August 4, 2016, based on the allegations of double-dipping.

On December 14, 2016, Major Young met with plaintiff to discuss his affirmative response on the productive work environment advisory.  On December 19, Major Young prepared a memorandum to Deputy Chief Smith which recounted the concerns that plaintiff had expressed in their meeting.  In relevant part, Major Young's memorandum stated as follows: (1) plaintiff's affirmative answer to question #2 was in regard to the IA investigation regarding time recording and accountability issues while he was in the DPD; (2) for the past year, while plaintiff was assigned to West Patrol, he did not have any complaints or issues with his peers, supervisors or West Patrol commanders; (3) the DPD was under scrutiny because a commissioner's friend did not like the program and did not like the mayor; and (4) plaintiff felt that the complaint regarding his time in the DPD was the result of a political feud and that defendant should reinvestigate the facts, complaining persons and the discipline that he received.  Exhibit #21, Memorandum To LTC Rodney Smith From Major Solomon Young Dated December 19, 2016 (Doc. #68-10) at 97-98.

## XII.    Report Desk Complaints (January through July of 2017)

In January of 2017, defendant awarded plaintiff the report desk position at police headquarters.  Sgt. Shenee Davis, who is bi-racial (African-American and white), supervised him. Plaintiff asserts that because of race or in retaliation for complaining about discrimination, defendant repeatedly disciplined him and monitored his activities.  On February 23, 2017, for

example, Sgt. Davis told him that someone had complained to a major that a citizen had gone up to the detective bureau without an escort.   Plaintiff explained that the citizen was a city employee. Sgt. Davis discussed the complaint with the major and told plaintiff that he should not allow anyone to go beyond the lobby without an escort.   Plaintiff asked for the direction in writing, so Sgt. Davis sent him an email.   Defendant did not discipline plaintiff, but he believed that Sgt. Davis was constantly monitoring his activities in retaliation for his complaints of discrimination.

On March 8, 2017, plaintiff took a bathroom break and Deputy Chief Garner, who was looking for him, asked over the radio which bathroom plaintiff was using.   Plaintiff was humiliated, and he believes that the question was retaliatory.

On May 19, 2017, plaintiff took his 30-minute lunch break and left a citizen waiting for him to take a report.   Plaintiff told the citizen that he would assist him when he returned from lunch and had time to take his report.   Defendant did not require plaintiff to inform Sgt. Davis when he left for lunch, so he left for lunch without informing Sgt. Davis that he was going to take a lunch break or that someone was waiting.

When plaintiff returned from lunch, Sgt. Davis told him to follow her out of the lobby and escorted him to her office.   In plaintiff's opinion, her manner was improper, disrespectful and hostile.   Sgt. Davis alerted him that a citizen had complained and that she might impose discipline. Plaintiff verbally complained to East Patrol Captain Steve Owen, the day shift commander, and orally and in writing to West Patrol Captain George Sims.   Specifically, plaintiff stated, "Sgt. Davis intentionally exhibited a formal display of discipline towards [him] publicly in front of Record Services personnel, that possibly initiated or was a part of, the false complaint made against [him]."   Exhibit #28, Email From John Turner To George Sims Dated June 1, 2017 (Doc. #68-11) at 16.   He felt that "the behavior exhibited by Sgt. Davis was improper, disrespectful and

create[d] an unproductive and hostile type of work environment for [him]."   Id.

On May 25, 2017, Sgt. Davis issued plaintiff a letter of discipline for violating Rule 2.14 by failing to provide prompt, correct and courteous service to the citizen on May 19.   The letter stated the reason for the discipline as follows: "On 05/19/2017 you failed to provide prompt courteous service to our citizens by taking your lunch break in lieu of completing a report.   The citizen had been waiting for a report for approximately forty (40) minutes and you failed to make other arrangements for the report to be taken prior to leaving for lunch."   Exhibit #28, Letter Of Discipline From Sgt. S.C. Davis To Officer John Turner (Doc. #68-11) at 15.   The discipline was 15 points, which is what the Rules and Regulations specify.   The union filed a grievance with Captain Owen, who denied it.   The union appealed up the chain of command with no success. On June 8, 2017, after the discipline from Sgt. Davis, plaintiff received a Performance Evaluation that downgraded his work performance.   Plaintiff does not believe that Sgt. Davis harbors racial animus towards him, but he believes that she retaliated against him because he was out of favor with Chief Zeigler.

On July 13, 2017, Captain Owen issued a memorandum entitled "Report Desk Duties and Responsibilities" which required plaintiff to use a specific restroom in the lobby.   Major Kent Anderson, division commander over East Patrol, directed Captain Owen to prepare the memorandum so that officers knew their duties at the report desk, and he required report desk officer to use the lobby restroom because it is closest to the report desk.   Captain Owen thought that this would cut down on wait time for citizens.   To plaintiff, the requirement that he use the restroom closest to the lobby was retaliatory because no other officer has such a restriction.

## XIII.   Second Internal Complaint Of Discrimination (June of 2017)

On June 8, 2017, plaintiff received his performance evaluation for January 1 through

June 1, 2017.   On the second question of the Productive Work Environment Advisory, plaintiff again checked the "yes" box.   The next day, he submitted a two-page explanation, which listed everything which he believed was discriminatory or retaliatory up to that point, including most of the employment actions taken before June of 2017 that are the subjects of this lawsuit.

Major Anderson met with plaintiff to discuss his concerns and prepared a memorandum to Chief Zeigler dated June 13, 2017, which summarized plaintiff's complaints.   Major Anderson understood that plaintiff was complaining about a hostile work environment and retaliation.   Chief Zeigler reviewed Major Anderson's memorandum and had Deputy Chief York respond to plaintiff's allegations.   Defendant did not investigate plaintiff's allegations.

## XIV.   Additional Report Desk Complaints (October and November of 2017)

In October and November of 2017, Captain Owen investigated two complaints in which citizens accused plaintiff of not taking reports.   One citizen had waited for over two hours before plaintiff served her.   When plaintiff met with her a few minutes before closing, he told her that she would need to bring in additional paperwork and that he would call her the next day.   Captain Owen recommended that both complaints be classified as "No Discipline Warranted," but advised plaintiff that if someone was waiting for a report for longer than an hour, he should call for additional help.

From September through December of 2017, command staff and co-workers constantly monitored plaintiff, which made him feel uncomfortable.

## XV.   Veracity List Disclosure Letter (January 31, 2018)

On January 31, 2018, Captain Schumaker made a mistake in his veracity list disclosure letter to plaintiff when he accidentally said that he had an obligation to notify prosecutors about a finding that plaintiff had violated Rule 3.23.   This was incorrect because after the grievance board

hearing, Chief Zeigler had rescinded plaintiff's Rule 3.23 violation and only plaintiff's Rule 3.16 violation remained.   Captain Schumaker testified that the disclosure letter should have said Rule 3.16.

### XVI.   Complaint From Fellow Officer (March of 2018)

On March 1, 2018, when plaintiff was on his way to lunch, he saw an incapacitated man in front of the building next door to police headquarters.   Plaintiff stopped and called dispatch. When the patrol officer responded, she told plaintiff that she would handle it and plaintiff went to lunch down the street.   Shortly after that, the patrol officer called for backup.   Before plaintiff could respond, another officer arrived to assist.

The patrol officer complained that plaintiff had left her unattended with a man who needed assistance.   On March 8, 2018, Sgt. Lucas Graves issued plaintiff a letter of discipline for violating Rule 3.22, which states, "Officers shall always maintain competence in the performance of their duties."   Exhibit #30, Letter Of Discipline From Sgt. L. Graves To Officer John Turner Dated March 8, 2018 (Doc. #68-11) at 23.   Sgt. Graves imposed a two-day suspension.

On March 22, 2018, the union grieved this discipline and defendant amended it to a violation of Rule 2.14 (failure to provide prompt, correct and courteous service), which reduced his two-day suspension to 15 points.   Plaintiff asserts that as the report desk officer, responding to people on the street is not his job, and that this discipline was retaliatory.

### XVII.   Alleged Disparate Discipline Of White And Black Officers (Approx. 2015 through 2018)

Plaintiff claims that defendant treats white officers more favorably than black officers. Specifically, plaintiff asserts as follows:

(1) On July 7, 2017, plaintiff notified Internal Affairs Captain Schumaker that 19 months earlier, Detective Waldeck, who is white, had sent an email for her off-duty

employment during work hours.   Deputy Chief Garner determined that Detective Waldeck did not have a pattern of misusing government resources and he did not discipline her for the email or initiate an IA investigation.   Deputy Chief Garner also testified that Detective Waldeck's action in sending the email was reasonable in light of department policy.   Exhibit #12, Deposition Of Deputy Chief Tyrone Garner (Doc. #74-11) at 9-12.

(2) Chief Zeigler was accused of double-dipping but was not removed from his position or placed on leave during the investigation.

(3) Defendant did not discipline Detective J.G., who is white, for sending out emails during work hours inquiring for officers looking for off-duty work.   Exhibit #1, Deposition Of John Turner (Doc. #74-1) at 86.

(4) Defendant did not discipline Commander R.Q., who is white, for sending out emails during work hours inquiring for officers looking for off-duty work.   Id. at 345.

(5) Defendant did not investigate a white commander whom defendant accused of not working his full hours and counting his commute as work hours.

(6) Officers J.C., N.K., J.W. and D.D, who are white, admitted that they went home early and were paid for entire shifts.   Defendant did not discipline them for falsely recording their work hours and did not place them on the veracity list.

(7) Defendant suspended Officer Kopp, who is white, for placing two cadets in danger but did not remove him from the Crime Scene Investigation Unit.   On another occasion, defendant gave Officer Kopp 15 discipline points for making inappropriate comments at an elementary school.

-20-

(8) Defendant did not place Sgt. D.S., who is white, on the veracity list or remove him from his position when he failed to include in a report that he had used force during an arrest.

(9) For some undisclosed violation, defendant disciplined Sgt. G.D., who is white, for an off-duty incident.  After the discipline, Sgt. G.D. returned to the same position on the dayshift in East Patrol.

(10)   Many officers did not turn in off-duty employment forms and defendant did not discipline them.   Defendant only disciplined plaintiff for this violation.

(11)   Chief Zeigler demoted Deputy Chief Smith for having an extra-marital sexual relationship on defendant's property, but Chief Zeigler did not suspend him or initiate an IA investigation.   The record reflects that Deputy Chief Smith disclosed the affair to Chief Zeigler and, as a result, Chief Zeigler found that he had violated General Order 1.10 (Code of Ethics) and Rule 2.27 and demoted Deputy Chief Smith to the rank of captain.   See Letter Of Discipline Dated February 14, 2017 (Doc. #74-2) at 92.[7]

(12)   Officers J.C., N.K., J.W. and D.D. and Sgts. P.T. and J.S., who are white, made false entries on their timesheets but defendant did not add them to the veracity list.

(13)   For some undisclosed violation, defendant disciplined Captain R.B., who is white, but did not remove him from his position.

---

[7]     Plaintiff also asserts that "it is [his] understanding" that Deputy Chief Smith had not been truthful in an IA investigation regarding his time as a captain in the animal control unit. Exhibit #2, Affidavit Of John Turner (Doc. #74-2) at 7.   To support this claim, plaintiff cites his own affidavit.

(14)   Captain A.K., who is white, took unlawful possession of property that belonged to the CSI unit.  Defendant did not remove him from his position and instead allowed him to quietly retire.

(15)   For an investigation into some undisclosed violation, defendant demoted Sgt. J.D., who is black, gave him 30 days off, placed him on the veracity list and prohibited him from off-duty employment.   After a grievance, defendant removed the 30 days off of work.

(16)   In 2015, defendant accused Captain Victor Webb, who is black, of sexual harassment.  Pending the investigation, Chief Zeigler placed him on administrative leave for three months, confined him to his home during work hours and prohibited him from obtaining off-duty employment.   Chief Zeigler found no evidence of sexual harassment but nevertheless suspended Captain Webb for 40 days and transferred him to the night shift.   On October 17, 2016, Chief Zeigler initiated another investigation into Captain Webb for a hostile work environment complaint and eventually demoted him to the lowest possible rank.

(17)   In early 2017, defendant initiated an IA investigation into some undisclosed violation by Major Young, who is black, for an off-duty incident.   After the investigation, Chief Zeigler terminated Major Young's employment but later allowed him to resign.

See Statement Of Facts #533-609, Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment ("Plaintiff's Response") (Doc. #73) filed November 26, 2019 at 103-14.

## XVIII.   Plaintiff's EEOC Charge (May 22, 2017)

On May 22, 2017, plaintiff filed a charge with the Equal Employment Opportunity

Commission ("EEOC") which alleged that defendant has subjected him to discrimination, retaliation and harassment because of racial animus.   Among other things, he noted the DPD investigation, the off-duty employment form suspension, the veracity list, disparate treatment of black officers, his performance evaluations and the report desk incidents.

## XIX.   Current Lawsuit (April 25, 2018)

On April 25, 2018, plaintiff filed his complaint for employment discrimination, harassment and retaliation based on race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq.   Pretrial Order (Doc. #55).   On October 21, 2019, defendant filed this motion for summary judgment on all claims.   Defendant's Motion For Summary Judgment (Doc. #66).

### Legal Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007).   A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."   Liberty Lobby, 477 U.S. at 248.   A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.   Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).   Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.   Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus.

Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).   To carry this burden, the nonmoving

party may not rest on the pleadings but must instead set forth specific facts supported by competent

evidence.   Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party.   See

Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).   It may

grant summary judgment if the nonmoving party's evidence is merely colorable or is not

significantly probative.   See Liberty Lobby, 477 U.S. at 250-51.   In response to a motion for

summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion, and may

not escape summary judgment in the mere hope that something will turn up at trial.   Conaway v.

Smith, 853 F.2d 789, 794 (10th Cir. 1988); Olympic Club v. Those Interested Underwriters at

Lloyd's London, 991 F.2d 497, 503 (9th Cir. 1993).   The heart of the inquiry is "whether the

evidence presents a sufficient disagreement to require submission to the jury or whether it is so

one-sided that one party must prevail as a matter of law."   Liberty Lobby, 477 U.S. at 251-52.

## Analysis

Under Title VII, plaintiff asserts three race-based claims: (1) disparate treatment; (2) hostile

work environment; and (3) retaliation.[8]   Defendant asserts that it is entitled to summary judgment

because (1) plaintiff failed to exhaust administrative remedies for several claims, (2) plaintiff

---

[8]        Count I asserts "race discrimination and harassment in terms and conditions in
employment."   Pretrial Order (Doc. #55) at 21.   The Court construes it as asserting separate
claims for disparate treatment and hostile work environment.

cannot establish a prima facie case for any claim and (3) defendant acted for legitimate, non-discriminatory reasons.

I.      **Timeliness**

Defendant asserts that to the extent plaintiff's claims are based on events that occurred more than 300 days before May 22, 2017, the date plaintiff filed his EEOC charge, they are time-barred.

A.      **Disparate Treatment Race Discrimination And Retaliatory Adverse Employment Action Under Title VII**

Under Title VII, plaintiff must base his claims for disparate treatment and retaliatory adverse employment action on discrete acts.   National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002); Payan v. United Parcel Service, 905 F.3d 1162, 1168 (10th Cir. 2018).   If plaintiff fails to timely file an EEOC charge regarding each discrete employment incident or adverse action, defendant may raise an affirmative defense of failure to exhaust.   Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1185 (10th Cir. 2018).   To exhaust, plaintiff generally must present his claims to the EEOC or authorized state agency (here, the Kansas Human Rights Commission ("KHRC")) and receive a right-to-sue letter based on that charge.   Id. at 1181.   In Kansas, plaintiff must file an administrative charge within 300 days of the alleged discriminatory action. See 42 U.S.C. § 2000e-5(e)(1).   The charge "shall be in writing and signed and shall be verified," 29 C.F.R. § 1601.9, and must at a minimum identify the parties and "describe generally the action or practices complained of," 29 C.F.R. § 1601.12(b).   The charge tells the EEOC or KHRC what to investigate, provides the opportunity to conciliate the claim and gives the charged party notice of the alleged violation.   See Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003).   The

timeliness requirement is like a statute of limitations, i.e. subject to waiver, estoppel and equitable tolling.   Zipes v. Trans World Airlines, 455 U.S. 385, 393 (1982).

Here, plaintiff filed his EEOC charge on May 22, 2017.   As a matter of law, any claim of disparate treatment race discrimination or retaliatory adverse employment action that is based on an event which occurred prior to July 26, 2016 (i.e., 300 days before plaintiff filed his charge) is therefore time-barred.   See Morgan, 536 U.S. at 113 ("Each discrete discriminatory act starts a new clock for filing charges alleging that act.").   Indeed, plaintiff concedes that he did not exhaust administrative remedies for discrete acts that occurred before July 26, 2016.   Accordingly, for plaintiff's disparate treatment and retaliation claims, only events which occurred after July 26, 2016 are actionable.   As a result, the following events are not independently actionable:

1. Defendant's investigation into allegations that plaintiff was double-dipping (December of 2015 through March of 2016);

2. Chief Zeigler's decision to place plaintiff on administrative leave (March 12, 2016);[9] and

3. Defendant's failure to complete performance evaluations for plaintiff (December of 2015 and June of 2016).

Plaintiff may only use these prior events as background evidence in support of timely claims.   Id.

---

[9]        Defendant seeks summary judgment on the claims that it unlawfully discriminated against plaintiff by investigating the allegations of double-dipping and placing plaintiff on administrative leave on March 12, 2016.   Plaintiff does not seek to hold defendant liable for the discrete act of placing him on paid administrative leave on March 12, 2016 and does not claim that the investigation was adverse action.   In addition, plaintiff concedes that claims based on events that occurred prior to July 26, 2016 are untimely.   See Plaintiff's Response (Doc. #73) at 118-19. Plaintiff asserts that these events are evidence of a pattern of harassment, not discrete acts of discrimination.   Accordingly, defendant's summary judgment motion on these claims is moot.

### B.        Hostile Work Environment Under Title VII

As with claims for disparate treatment and retaliation, in Kansas, plaintiff must file a hostile work environment claim under Title VII within 300 days of the unlawful employment practice. But unlike disparate treatment and retaliation, a hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice."   42 U.S.C. § 2000e-5(e)(1).   To determine liability, if an act that contributes to the claim occurs within the filing period, the Court may consider the entire time period of the hostile environment.   Morgan, 536 U.S. at 117.

Here, plaintiff alleges that defendant began harassing him because of race in December of 2015, with the IA investigation into double-dipping, and that a pattern of harassment continued through at least April of 2017.   Plaintiff's Response (Doc. #73) at 119.   Because plaintiff's hostile work environment claim includes several events that occurred within the filing period (i.e., after July 26, 2016), the Court may consider events that contribute to the hostile work environment even if they fall outside the 300-day period.

## II.    Merits

### A.        Disparate Treatment Race Discrimination Under Title VII

Count I asserts that defendant discriminated against plaintiff because of race in violation of Title VII.   Pretrial Order (Doc. #55) at 21.   Defendant asserts that plaintiff cannot establish a prima facie case of disparate treatment or show pretext for the following discrete acts: (1)  suspending plaintiff for 30 days, removing him from the DPD and not reinstating him; (2) disciplining plaintiff for failing to submit an off-duty employment form; (3) including plaintiff

in the early warning system;[10] (4) including plaintiff on the veracity list; and (5) addressing report desk complaints against him.[11]   As noted, for plaintiff's disparate treatment claims, the Court does not consider discrete acts that occurred before July 26, 2016.

The burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to plaintiff's disparate treatment claims.   Plaintiff bears the initial burden to establish a prima facie case.   To establish a prima facie case of discrimination, he must demonstrate that (1) he belongs to a protected class, which the parties do not dispute; (2) he suffered adverse employment action; and (3) the challenged action took place under circumstances which give rise to an inference of discrimination.   Bird v. Regents of New Mexico State Univ., 619 F. App'x 733, 741 (10th Cir. 2015); Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002).   If plaintiff sets forth a prima facie case, the burden then shifts to defendant to provide a legitimate, nondiscriminatory reason for the action.   McDonnell Douglas, 411 U.S. at 802.   If defendant successfully does so, the burden shifts back to plaintiff to show that defendant's stated reason is a pretext for discriminatory intent.   Id. at 804.

---

[10]   Plaintiff does not claim that the early warning system was a discrete act of discrimination.   Rather, he asserts that the early warning system notification was evidence of a hostile work environment.   Plaintiff's Response (Doc. #73) at 120.   Accordingly, defendant's motion for summary judgment on this issue is moot.

[11]   Defendant seeks summary judgment on plaintiff's claim that the discipline that he received while working at the report desk was discrimination based on race.   Memorandum In Support Of Summary Judgment (Doc. #67) at 62.   In response, plaintiff appears to abandon any such claim.   Specifically, he states, "While Plaintiff was subjected to some discrete discriminatory conduct after he began work on the Report Desk, he testified consistently that he was working in a racially hostile work environment."   See Plaintiff's Response (Doc. #73) at 128.   Plaintiff addresses defendant's report desk arguments only in the context of his hostile work environment claim.   Accordingly, defendant's motion for summary judgment on this claim is moot.

### 1. Suspending Plaintiff For 30 Days, Removing Him From DPD and Not Reinstating Him

On August 4, 2016, in conjunction with Deputy Chief Garner's conclusions regarding the allegations of double-dipping, Chief Zeigler suspended plaintiff without pay for 30 days, removed him from the DPD and prohibited him from re-bidding into the DPD for 25 months for violations of Rule 3.16 (false reports) and Rule 3.23 (dishonesty). In April of 2017, the grievance board held a hearing on plaintiff's suspension and removal. It reduced plaintiff's suspension to three days and overturned the determination that he had violated Rule 3.23 but upheld the determination that he had violated Rule 3.16. Plaintiff did not ask for reinstatement, and Chief Zeigler did not reinstate him. Plaintiff asserts that this discipline and the failure to reinstate him constituted race discrimination. Defendant's motion for summary judgment assumes that plaintiff has set forth a prima facie case of disparate treatment but asserts that Chief Zeigler had legitimate and nondiscriminatory reasons for the discipline in that plaintiff had violated Rules 3.16 and 3.23, and failure to reinstate him in that the grievance board determined that plaintiff had violated Rule 3.16. Defendant also asserts that Chief Zeigler concluded that plaintiff could not remain in the DPD because it was a politically sensitive unit that had close contact with elected officials and plaintiff committed the Rule 3.16 violation in performance of his DPD duties. Finally, defendant states that in 2015, Chief Zeigler suspended two white officers for falsifying police reports in violation of Rule 3.16.

Because defendant has stated legitimate and nondiscriminatory reasons for its actions, plaintiff must show that defendant's stated reasons are pretext for race discrimination. McDonnell Douglas, 411 U.S. at 804. At this final step of the McDonnell Douglas framework, "the presumption of discrimination created by" plaintiff's "prima facie case 'simply drops out of

the picture.'"   Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1167 (10th Cir. 2007)

(quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993)).   At this stage, plaintiff carries

the full burden of persuasion to show that defendant discriminated against him on the illegal basis

of race.   Id. (citing Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1125 (10th Cir. 2005)).

Plaintiff shows "pretext by demonstrating such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for

its action that a reasonable factfinder could rationally find them unworthy of credence and hence

infer that the employer did not act for the asserted nondiscriminatory reasons."   Id. (quotation

omitted).   A common method by which plaintiff may show pretext – and the method on which

plaintiff relies in this case – is arguing disparate treatment.   Id.

Under this approach, plaintiff establishes pretext by demonstrating that defendant treated

him differently from comparable employees.   Id. at 1167-68.   To be a valid comparator, other

employees must be similarly situated to plaintiff in all material respects and have violated work

rules of comparable seriousness.   Id. at 1167; Lucero v. Sandia Corp., 495 F. App'x 903, 909

(10th Cir. 2012); Macon v. UPS, 743 F.3d 708, 717 (10th Cir. 2014).   In addition, a comparator

must have: (1) "deal[t] with the same supervisor," and (2) been "subject to the same standards

governing performance evaluation and discipline."   Aramburu v. Boeing Co., 112 F.3d 1398,

1404 (10th Cir. 1997).   The Court also compares the relevant employment circumstances that are

applicable to plaintiff, such as work history and company policies, and the intended comparable

employees.   Id.   Whether employees are similarly situated is a fact-intensive inquiry, and what

facts are material varies depending on the case.   Lucero, 495 F. App'x at 909.

Disparate treatment does not create an inference of discrimination if defendant's

differential treatment of similarly-situated employees is trivial or accidental or explained by a

nondiscriminatory motive.   <u>Swackhammer</u>, 493 F.3d at 1168 (citing <u>Kendrick v. Penske Transp.</u> <u>Servs., Inc.</u>, 220 F.3d 1220, 1232 (10th Cir. 2000)); <u>EEOC v. Flasher Co.</u>, 986 F.2d 1312, 1321 (10th Cir. 1992) (inference of illegal discrimination not legally compelled by irrational or accidental disparate treatment between minority and non-minority employees).   "[T]he existence of differential treatment[ ] defeats summary judgment only if it could reasonably lead the trier of fact to infer a discriminatory motive; where the evidence of pretext supports only nondiscriminatory motives, such an inference is logically precluded and summary judgment for the employer is appropriate."   <u>Swackhammer</u>, 493 F.3d at 1168.

In this respect, plaintiff offers two arguments to show pretext.  First, he asserts that defendant's failure to investigate double-dipping by white DPD officers demonstrates pretext. Second, plaintiff generally asserts that defendant has treated white officers more favorably and reinstated those officers even after it disciplined them.

During the relevant period, Officer Blake was the only white officer in the DPD. Detective Waldeck testified that she only investigated plaintiff and Officer Williams because the commissioner had only accused them (and not others) of double-dipping.   <u>Kendrick</u>, 220 F.3d at 1232 (differences in treatment explained by nondiscriminatory motive will not sustain claim of pretext).   The record contains no evidence that Officer Blake was double-dipping or that he had been accused of double-dipping.   Furthermore, as a secondary DPD officer, Officer Blake only worked in the DPD once a month and was not similarly situated to plaintiff.

As to his second argument, plaintiff asserts generally that "[b]lack officers have been treated differently than white officers accused of 'double dipping.'"   <u>Plaintiff's Response</u> (Doc. #73) at 122.  Plaintiff states that "[w]hite officers subjected to internal affairs investigations for sustained complaints of major violations of the Rules and Regulations have been reinstated to their

positions, even after receiving discipline." Plaintiff's Response (Doc. #73) at 125. Specifically, plaintiff asserts that Detective Waldeck and Chief Zeigler have engaged in similar misconduct yet received more favorable treatment. He then refers generally to "white officers" and "black officers," and cites his fact section. See Plaintiff's Response (Doc. #73) at 122 (citing Statement Of Fact #533-609). Plaintiff's bare assertion that defendant treats white officers more favorably than it treated him does not create a genuine issue of material fact whether Chief Zeigler's reasons for suspending him for 30 days, removing him from the DPD and not reinstating him are pretext for race discrimination. Furthermore, plaintiff has not met his burden to show that generic unidentified "white officers" were similarly situated to him in all material respects. See Lucero, 495 F. App'x at 909. Specifically, as to such officers, plaintiff fails to show that potential comparators engaged in misconduct of comparable seriousness to his Rules 3.16 and 3.23 violations, and he fails to rule out nondiscriminatory explanations for any differential treatment. See Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1121 (10th Cir. 2007) (to show pretext based on differential treatment, plaintiff must rule out nondiscriminatory reasons).

Plaintiff's arguments regarding Chief Zeigler and Detective Waldeck do not create a genuine issue of material fact as to pretext. Chief Zeigler, as Chief of Police, is not a valid comparator. A valid comparator must be subject to the same performance and disciplinary standards as plaintiff. Aramburu, 112 F.3d at 1404. Furthermore, plaintiff has not shown that Detective Waldeck violated work rules of comparable seriousness to dishonesty or making false reports.[12]

---

[12]     Plaintiff asserts that on July 7, 2017, he notified Internal Affairs Captain Schumaker that 19 months earlier, Detective Waldeck had sent an email for her off-duty employment during work hours. Deputy Chief Garner determined that Detective Waldeck did not have a pattern of misuse of government resources and did not discipline her for the email or initiate an IA

Other than Detective Waldeck and Chief Zeigler, plaintiff does not specifically argue that identified white officers engaged in similar misconduct but received more favorable treatment. The record contains evidence, however, that defendant accused Sgt. J.A., who is white, of double dipping, but did not place him on administrative leave or remove him from his position.   For purposes of summary judgment, Sgt. J.A. is a valid comparator because he committed rules violations of comparable seriousness to plaintiff's violations.   See Exhibit J, Letter Of Discipline Dated April 9, 2019 (Doc. #74-2) at 96.   Specifically, Sgt. J.A. admitted that he routinely left work early to go to his off-duty job and received pay from defendant and his off-duty employer for the same time.   Defendant disciplined Sgt. J.A. for violations of Rule 3.23 (dishonesty), 1.10 (code of ethics), 2.24 (failure to supervise subordinates) and 20.07 (off-duty employment). Although defendant imposed a 45-day suspension, placed him on the veracity list and issued a last chance agreement, defendant did not remove Sgt. J.A. from the community policing unit, which was a high-profile unit like the DPD.   Sgt. J.A. was similarly situated to plaintiff, and defendant's

---

investigation.   Sending one email is not a rule violation of comparable seriousness to plaintiff's Rule 3.16 and 3.23 violations for submitting false reports and dishonesty, particularly in light of Deputy Chief Garner's testimony that he did not discipline Detective Waldeck because he thought that her behavior was reasonable in light of department policy.   Exhibit #12, Deposition Of Deputy Chief Tyrone Garner (Doc. #74-11) at 9-12.

Plaintiff further asserts that defendant investigated him for conduct that was three years old (i.e. the sexting incident) but did not investigate Detective Waldeck for the email which was only 19 months old.   Even if this is true, it does not raise a genuine issue of material fact whether defendant's reasons for suspending plaintiff for 30 days, removing him from the DPD and not reinstating him are pretextual.   The timing of plaintiff's discipline for the sexting incident bears no relationship to the double-dipping investigation, and plaintiff has conceded that defendant did not discipline him for the sexting incident because of his race.

In short, the record does not suggest that Detective Waldeck's one inappropriate email was a violation of comparable seriousness to plaintiff's violations.

differential treatment of him creates a genuine issue of material fact whether defendant's non-discriminatory reason for removing plaintiff from the DPD was pretextual.[13]

Defendant is not entitled to summary judgment on this claim.

### 2.   Disciplining Plaintiff For Failing To Submit An Off-Duty Employment Form

On September 28, 2016, Deputy Chief Garner, who is African-American, imposed a one-

---

[13]     Plaintiff asserts that 12 other white officers are valid comparators for purposes of his disparate treatment claim.  To prove that defendant treated him differently than similarly situated white officers, plaintiff must identify white officers who are similarly situated in all material respects, have dealt with the same supervisor, are subject to the same performance and discipline standards and have violated work rules of comparable seriousness.  As explained below, except for Sgt. J.A., plaintiff has not done so.

Sgt. G.D. and Captain R.B.: These two officers are not valid comparators because plaintiff fails to demonstrate that they violated work rules of comparable seriousness for on-duty incidents.

Detective J.G. and Commander R.Q.: These officers allegedly sent off-duty employment emails during work hours.  Sending such emails is not a violation of comparable seriousness to plaintiff's violations of Rule 3.16 and 3.23, so Detective J.G. and Commander R.Q. are not valid comparators.

Officers J.C., N.K., J.W. and D.D.: These officers allegedly admitted that they went home early but were still paid for entire shifts.  Leaving early on one day is not an offense of comparable seriousness to plaintiff's Rule 3.16 and 3.23 violations.  In addition, plaintiff does not offer evidence that these officers were in a politically sensitive unit like the DPD.

Officer Kopp: Officer Kopp allegedly placed two cadets in danger and made inappropriate comments at an elementary school.  Plaintiff does not explain how Officer Kopp's violations equate to his violation of Rules 3.16 and 3.23.  Officer Kopp is not a valid comparator.

Sgt. D.S.: Sgt. D.S. allegedly failed to report that he had used force during an arrest.  Plaintiff cites no evidence which suggests that he is a valid comparator.

Deputy Chief Smith: Deputy Chief Smith admitted to Chief Zeigler that he had an extra-marital sexual relationship on defendant's property.  See Letter Of Discipline Dated February 14, 2017 (Doc. #74-2) at 92.  Also, Deputy Chief Smith was allegedly untruthful in an IA investigation regarding his time as a captain in the animal control unit.  Plaintiff has not demonstrated that Deputy Chief Smith was similarly situated to him in all material respects.

Captain A.K.: Captain A.K. allegedly took unlawful possession of property when he retired from the CSI unit.   Plaintiff's information about Captain A.K. is hearsay and does not suggest that he was similarly situated to plaintiff.

In summary, plaintiff has not shown that the foregoing white officers were similarly situated to him in all material respects and violated work rules of comparable seriousness.  Moreover, none of them worked in politically sensitive units comparable to the DPD.

day suspension on plaintiff for not submitting a mandatory off-duty employment form for 2016. Plaintiff asserts that this one-day suspension constituted race discrimination.  Assuming that plaintiff has set forth a prima facie case, defendant asserts that as a matter of law, it had a legitimate and nondiscriminatory reason for the suspension, i.e. that plaintiff had in fact failed to submit a mandatory off-duty employment form and that a one-day suspension is the minimum discipline for such a policy violation.  Because defendant has asserted a legitimate nondiscriminatory reason, plaintiff must show that the one-day suspension was pretext for race discrimination.

Defendant has never enforced the off-duty employment form rule against any officer other than plaintiff, and plaintiff asserts that this shows pretext.   That defendant had never enforced rule until it enforced the rule against plaintiff creates a genuine issue of material fact as to pretext.   See Kendrick, 220 F.3d at 1230 ("A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.")   This evidence is sufficient to create a genuine issue of material fact as to the claim. Defendant is not entitled to summary judgment on this claim.

### 3.  Including Plaintiff On The Veracity List

Plaintiff asserts that defendant placed him on the veracity list because of his race. Defendant asserts that it is entitled to summary judgment on this claim because (1) plaintiff did not mention the veracity list in his EEOC charge and therefore failed to exhaust administrative remedies, (2) defendant placed him on the veracity list in 2016 for legitimate and nondiscriminatory reasons and (3) as to plaintiff's inclusion on the list in 2017 and 2018, defendant did not take adverse action against him.

As an initial matter, defendant's assertion that plaintiff did not mention his inclusion on

the veracity list in his EEOC charge is misplaced.   Plaintiff mentioned the veracity list two times. Accordingly, defendant's claim that plaintiff failed to exhaust administrative remedies on this ground is baseless.

### a.   Veracity List For 2016 (October of 2016)

Defendant asserts that Chief Zeigler included plaintiff on the veracity list in 2016 because he had disciplined plaintiff for violating Rule 3.16 (making false reports) and Rule 3.23 (dishonesty).   If true, this is a legitimate nondiscriminatory reason, and plaintiff must show that it is pretextual.

As evidence of pretext, plaintiff asserts that defendant has not placed white officers on the veracity list who have committed comparable violations.   As noted above, Sgt. J.A. is plaintiff's only valid comparator.   Plaintiff cannot show pretext based on differential treatment of Sgt. J.A., however, because defendant did place Sgt. J.A. on the veracity list.   Accordingly, the record reflects that defendant placed a similarly situated white officer who committed similar misconduct on the veracity list.   Plaintiff has not demonstrated a genuine issue of material fact whether Chief Zeigler placed him on the veracity list in 2016 as pretext for race discrimination.   Defendant is entitled to summary judgment on this claim.

### b.   Veracity List For 2017 and 2018

As to the veracity lists for 2017 and 2018, defendant asserts that Captain Schumaker made a mistake when he listed plaintiff for the sexting and off-duty employment form incidents and stated in plaintiff's veracity list disclosure letter that plaintiff had violated Rule 3.23 instead of Rule 3.16.   Plaintiff does not dispute that Captain Schumaker made a mistake and does not offer any evidence from which a reasonable jury could conclude that Captain Schumaker's real motive was racial animus.   See Toney v. Cuomo, 92 F. Supp. 2d 1186, 1193 (D. Kan. 2000) (deviation

from procedure, standing alone, not sufficient to find pretext); Williams v. Potter, 331 F. Supp. 2d

1331, 1345 (D. Kan. 2004), aff'd, 149 F. App'x 824 (10th Cir. 2005) (mistake is not evidence of

intentional discrimination).   Defendant is entitled to summary judgment on this claim.

### B.   Retaliation Under Title VII

In December of 2016, plaintiff complained internally about race discrimination and

harassment.   On May 22, 2017, he filed a charge with the EEOC.   On June 9, 2017, plaintiff

again complained internally about discrimination and harassment.   Plaintiff asserts that in

retaliation for his internal complaints and EEOC charge, defendant scrutinized his work more

closely, threatened him with disciplinary action, reviewed his work unfavorably, refused to

reinstate him to the DPD, placed him on the veracity list and unfairly disciplined him.   Defendant

asserts that it is entitled to summary judgment on plaintiff's claims that the following acts were

retaliatory: (1) failure to reinstate plaintiff to the DPD after the grievance board hearing in April

of 2017; (2) placing plaintiff on the veracity list; (3) interactions with Sgt. Davis and Deputy Chief

Garner at the report desk; (4) discipline imposed by Sgt. Davis in May of 2017; and (5) Captain

Owen's directive on report desk duties in July of 2017 and the discipline imposed by Sgt. Graves

and Captain Sims in 2018.   Defendant asserts that it is entitled to summary judgment because

(1) for most of his retaliation claims, plaintiff did not exhaust administrative remedies; (2) plaintiff

cannot establish a prima facie case; or (3) defendant acted for legitimate and non-retaliatory

reasons.

Under the burden-shifting framework of McDonnell Douglas, plaintiff must first establish

a prima facie case of retaliation.   411 U.S. at 802.   If he does so, the burden shifts to defendant

to articulate a legitimate and nonretaliatory reason for its actions.   Id.   From there, the burden

returns to plaintiff to show that defendant's reason is pretextual.   Id. at 804.   To establish a prima

facie case of retaliation, plaintiff must show that (1) he engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse and (3) a causal connection existed between his protected activity and the materially adverse action.   Payan, 905 F.3d at 1172.

### 1.   Failure To Reinstate Plaintiff To DPD After Grievance Board Hearing

Plaintiff asserts that defendant retaliated against him by not reinstating him to the DPD unit.   Defendant asserts that it is entitled to summary judgment on this claim because plaintiff cannot show a causal connection between his internal complaint in December of 2016 and Chief Zeigler's decision to not reinstate plaintiff to the DPD after the grievance board hearing in April of 2017.   Defendant also asserts that Chief Zeigler had legitimate and non-discriminatory reasons for removing plaintiff from the DPD.

To establish a sufficient causal connection, plaintiff must show that a desire to retaliate against his protected activity motivated defendant to commit the challenged conduct.   See Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1202-03 (10th Cir. 2008).   Protected conduct that is very closely followed by adverse action may justify an inference of retaliatory motive.   Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996).   For example, the Tenth Circuit has held that a six-week period between adverse action and protect activity is close enough in time to establish causation, but that a three-month period is not.   See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).

As a matter of law, the four months between plaintiff's internal complaint in December of 2016 and Chief Zeigler's decision to not reinstate plaintiff to the DPD after the grievance board hearing in April of 2017 is insufficient to establish causation.   See Hinds v. Sprint/United Mgmt. Co., No. 05-2362-KHV, 2006 WL 3715905, at *12 (D. Kan. Dec. 12, 2006), aff'd, 523 F.3d 1187

(10th Cir. 2008) ("Standing alone, four months between the protected activity and adverse action is insufficient to show causation."). Accordingly, plaintiff must produce additional evidence to show a causal connection. Id.

To do so, plaintiff argues that he has shown retaliatory motive based on the harsh treatment of black officers compared to white officers. He does not specify, however, the harsh treatment to which he refers and does not explain how it connects his protected activity with Chief Zeigler's decision not to reinstate him. Plaintiff then asserts, somewhat confusingly, that "[t]he Chief had no intention of returning [plaintiff] to the DPD unit. His intent never changed after Plaintiff filed his Charge of Discrimination making this retaliation claim." Plaintiff's Response (Doc. #73) at 139. Plaintiff's bare assertions are not sufficient evidence from which a reasonable jury could infer that after the grievance board hearing, Chief Zeigler decided not to reinstate plaintiff to the DPD in retaliation for plaintiff's complaint about discrimination. Plaintiff has not satisfied the causation element of his prima facie retaliation case. He therefore fails to meet his initial burden under McDonnell Douglas and defendant is entitled to summary judgment on this claim.

### 2. Placement On Veracity List

As noted, in October of 2016, Chief Zeigler placed plaintiff on the veracity list. Defendant asserts that it is entitled to summary judgment on plaintiff's claim that Chief Zeigler acted in retaliation for his protected opposition to discrimination because (1) plaintiff did not include this claim in his EEOC charge, (2) he cannot show causation and (3) defendant placed him on the veracity list for legitimate and non-discriminatory reasons.

Defendant's argument that plaintiff did not include this claim in his EEOC charge fails. The scope of the administrative investigation that can reasonably be expected to follow plaintiff's EEOC charge limits his claim in court. Smith v. Cheyenne Retirement Investors L.P., 904 F.3d

1159, 1164 (10th Cir. 2018).   In his EEOC charge, plaintiff checked the box for a retaliation claim, stated that defendant had listed him on the veracity list and asserted that he believed defendant's "disciplinary actions were directed at [him] out of racial animus or retaliation."   Plaintiff's EEOC Charge, Exhibit A to Complaint (Doc. #1) filed April 25, 2018.   Whether defendant placed plaintiff on the veracity list would fall within the scope of what plaintiff alleged in his EEOC charge.

As to causation, defendant asserts that plaintiff cannot establish a causal connection because he complained about discrimination in December of 2016, i.e. three months *after* defendant placed him on the list in October of 2016.   Plaintiff has not presented evidence that defendant placed him on the veracity list in retaliation for his *future* protected conduct.   Therefore, plaintiff has not shown a genuine issue of material fact regarding the causation element of his prima facie retaliation case.   Defendant is entitled to summary judgment on this claim.

### 3. Sgt. Davis's Directive And Deputy Chief Garner's Inquiry

In February of 2017, Sgt. Davis issued a directive to plaintiff that he should not allow visitors beyond the lobby without an escort.[14]   Plaintiff asserts that her directive shows that defendant was constantly evaluating him and criticizing his performance, and that this was retaliatory.

In March of 2017, Deputy Chief Garner inquired as to plaintiff's whereabouts.   When other officers informed him that plaintiff was on a restroom break, Deputy Chief Garner asked

---

[14]      Specifically, plaintiff states, "In February 2017, [plaintiff] was disciplined for allegedly allowing a visitor to go to the detective bureau unescorted.   While [he] did not receive discipline for not escorting the employee, there was constant evaluation and criticism of how he was doing his job which was retaliatory to him."   Statement of Fact #485-486, Plaintiff's Response (Doc. #73) at 96-97 (citations omitted).

which restroom he was in.   Plaintiff asserts that Deputy Chief Garner's question was "retaliatory harassment."   Statement of Fact #487, <u>Plaintiff's Response</u> (Doc. #73) at 97.

Defendant asserts that it is entitled to summary judgment on plaintiff's claims that Sgt. Davis's directive and Deputy Chief Garner's inquiry was retaliatory discipline.   Plaintiff does not respond to defendant's argument and therefore fails to establish a prima facie case that Sgt. Davis and Deputy Chief Garner's directive and inquiry was retaliation for protected conduct.   Defendant is entitled to summary judgment on this claim.

### 4.   Discipline From Sgt. Davis

On May 19, 2017, plaintiff went to lunch while a citizen waited for him to do a report and the citizen complained.   When he returned from lunch, Sgt. Davis "yelled in a loud voice," "Officer Turner, come with me."   Statement of Fact #491, <u>Plaintiff's Response</u> (Doc. #73) at 97. Sgt. Davis escorted plaintiff to her office and informed him that in response to the complaint, she might impose discipline.   On May 22, 2017, plaintiff filed his EEOC charge.   On May 25, 2017, Sgt. Davis determined that plaintiff had violated Rule 2.14 by failing to provide prompt, courteous service and imposed discipline of 15 points, which is the amount the Rules and Regulations specify.   Plaintiff asserts that this discipline was in retaliation for his EEOC charge.   Defendant asserts that it is entitled to summary judgment on plaintiff's claim because he cannot show adverse action or causation, and Sgt. Davis disciplined him for a legitimate and nonretaliatory reason.

Title VII's anti-retaliation provision does not protect an individual from all retaliation, but only from retaliation that produces an injury or harm, <u>i.e.</u> a materially adverse action.   <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 67-68 (2006).   A materially adverse action is one which may dissuade a reasonable employee from making a discrimination complaint.   <u>See Burlington N.</u>, 548 U.S. at 68; <u>Semsroth v. City of Wichita</u>, 548 F. Supp. 2d 1203, 1213 (D. Kan.

2008), aff'd, 555 F.3d 1182 (10th Cir. 2009).

Here, imposition of points that add up to more severe discipline would dissuade a reasonable employee from complaining about discrimination and therefore qualifies as adverse action.   Plaintiff has satisfied this element of a prima facie case.

As to causation, plaintiff asserts that the timing of Sgt. Davis's disciplinary action against plaintiff satisfies this element.   Plaintiff may demonstrate causation "by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."   Burrus v. United Tel. Co. of Kansas, 683 F.2d 339, 343 (10th Cir. 1982).   Because plaintiff filed his EEOC charge on May 22, 2017 and Sgt. Davis issued the discipline three days later, plaintiff satisfies a prima facie case and the burden shifts to defendant to state a legitimate and nonretaliatory reason for the discipline.

Defendant asserts that Sgt. Davis imposed the discipline because she determined that plaintiff went to lunch while a citizen was waiting, and the citizen had complained – a legitimate and nonretaliatory reason for her action.

As to pretext, plaintiff has not presented any evidence that Sgt. Davis disciplined him in retaliation for his protected opposition to discrimination.   Plaintiff does not deny that he went to lunch and left the citizen waiting, and testified that he does not believe that Sgt. Davis, who is bi-racial, harbors racial animus against him.   No reasonable jury could conclude that Sgt. Davis disciplined plaintiff in retaliation for his protected activity.   Defendant is entitled to summary judgment on this claim.

### 5.   Report Desk Directive And Complaint By Fellow Officer

On July 13, 2017, Captain Owen gave plaintiff a directive regarding report desk duties. Plaintiff was the only report desk officer, and the directive required him to use the restroom in the

lobby.   Plaintiff asserts that this directive was part of the "constant monitoring and harassment" he was experiencing, and that the restroom requirement was retaliatory harassment.   Statement of Fact #515, Plaintiff's Response (Doc. #73) at 101.

In March of 2018, a patrol officer complained that plaintiff had left her unattended with a man who needed assistance.   Sgt. Graves issued plaintiff a letter of discipline for the incident, which Captain Sims later modified.   Plaintiff asserts that as the report desk officer, responding to people on the street is not his job, and that this discipline was retaliatory.

For both the directive in July of 2017 and the discipline in March of 2018, defendant asserts that it is entitled to summary judgment because plaintiff failed to exhaust administrative remedies and cannot establish a prima facie case, and defendant acted for legitimate and nonretaliatory reasons.

Under Title VII, plaintiff must base his retaliation claim on discrete adverse actions.   Morgan, 536 U.S. at 113; Payan, 905 F.3d at 1168.   If plaintiff fails to timely file an EEOC charge regarding each discrete employment incident or adverse action, defendant may raise an affirmative defense of failure to exhaust.   Lincoln, 900 F.3d at 1185.   Plaintiff did not exhaust administrative remedies for his retaliation claims based on Captain Owen's report desk directive and the discipline from Sgt. Graves and Captain Sims.   On May 22, 2017, plaintiff asserted a claim with the EEOC for retaliatory acts that occurred *prior* to that date.   As noted above, plaintiff cannot sue on claims for which he did not seek an administrative remedy when those incidents occurred more than 300 days *prior* to the filing of his EEOC charge.   See Potter, 347 F.3d at 1210.   The Tenth Circuit has held that this rule is applies equally to retaliation claims based on discrete incidents which occurred *after* plaintiff filed his EEOC charge.   Id. at 1211.   That is, plaintiff must file new charges for any related discrete acts that occurred after he filed his EEOC charge.

Id.  Because plaintiff did not file an EEOC charge after May 22, 2017, he failed to exhaust administrative remedies for discrete adverse actions that occurred after that date.  Defendant is entitled to summary judgment on these claims.

## C.    Hostile Work Environment Under Title VII

Plaint asserts that defendant subjected him to a racially hostile work environment. Defendant asserts that it is entitled to summary judgment on this claim because plaintiff has not offered any evidence to support this claim.

To establish a prima facie case of hostile work environment harassment, plaintiff must demonstrate that based on the totality of the circumstances, (1) the harassment was pervasive or severe enough to alter the terms, conditions or privilege of employment, and (2) the harassment was racial or stemmed from racial animus.   Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998) (quoting Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994)).   A showing of pervasiveness requires "more than a few isolated incidents of racial enmity."   Bolden, 43 F.3d at 551 (citations and internal quotations omitted).   Plaintiff must show a "steady barrage of opprobrious racial comments" and produce evidence that the workplace was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive as to alter the conditions of his employment and create an abusive working environment.   Bolden, 43 F.3d at 551 (citation omitted); Bloomer v. United Parcel Service, Inc., 94 F. App'x 820, 825 (10th Cir. 2004) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).

Plaintiff asserts that defendant subjected him to a "daily barrage of unfair treatment by supervisors and co-workers."   Plaintiff's Response (Doc. #73) at 131.   He asserts that the entire workforce knew he was out of favor with Chief Zeigler and treated him poorly because of it.   Id. Specifically, as evidence of a racially hostile work environment, he asserts as follows: (1) officers

and the command staff subjected him to increased scrutiny; (2) his sergeant told him that he had to escort everyone out of the lobby or find someone else to escort them; (3) on one occasion, Deputy Chief Garner asked over the radio which bathroom plaintiff was using; (4) the command staff distributed a memorandum that required plaintiff to use a specific restroom near the lobby; (5) supervisors disciplined him for failure to provide prompt service; (6) Sgt. Davis publicly asked him to talk to her in private; (7) a supervisor told him not to talk to detectives; (8) supervisors disciplined him for failing to assist an officer at the scene of an incident; (9) defendant did not investigate his complaints; and (10) other black officers experienced pervasive harassment.  See id. at 131-32.

Plaintiff fails to establish a prima facie case of hostile work environment.  He does not present evidence of a "steady barrage of opprobrious racial comments" or explain how any of actions listed above "stemmed from racial animus."   Bolden, 43 F.3d at 551 (citation omitted). Simply showing that defendant disciplined him on various occasions and gave him workplace directives is insufficient.   Id. (general torment and taunting not actionable if not racially discriminatory).   In addition, plaintiff's hostile work environment claim fails because he bases it on isolated events without connection in time, character or person.   See Bloomer, 94 F. App'x at 824.   Absent additional evidence, he cannot simply string together the discrete events that comprise his retaliation and discrimination claims to create a hostile work environment claim. See id. at 825.  No reasonable jury could conclude that plaintiff's workplace was an abusive working environment that was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive as to alter the conditions of his employment.   Defendant is entitled to summary judgment on plaintiff's hostile work environment claim.

## <u>Conclusion</u>

Plaintiff has established a genuine issue of material fact as to the following claims (1) whether defendant did not reinstate him to the DPD because of race; and (2) whether defendant suspended him for failing to submit an updated off-duty employment because of race.

**IT IS THERFORE ORDERED** that <u>Defendant's Motion For Summary Judgment</u> (Doc. #66) filed October 21, 2019 is **SUSTAINED in part.**

Dated this 2nd day of March, 2020 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge